UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | : | |
|---|---|---|
| **BIANCA STEWART, et al.,** | : | Civil Action No. 22-4553 (SDW) (MAH) |
| Plaintiffs, | : | |
| v. | : | **REPORT AND RECOMMENDATION** |
| **KATINA STUCKEY-SMITH,** | : | |
| Defendant. | : | |

**HAMMER, United States Magistrate Judge**

This matter comes before the Court on Defendant Katina Stuckey-Smith's ("Defendant") motion to dismiss for lack of personal jurisdiction. D.E. 7. On October 3, 2022, Plaintiffs Bianca Stewart ("Stewart") and The Gladiator's Hub, Inc. ("TGH") (collectively "Plaintiffs") filed an opposition to the motion [D.E. 11], and on October 11, 2022, Defendant filed a reply in further support of her motion [D.E. 15]. The District Court referred this matter to the Undersigned to issue a Report and Recommendation. Pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1, the Undersigned did not hear oral argument and has considered this matter on the papers. For the reasons below, the Court concludes that this Court lacks personal jurisdiction over Defendant, and respectfully recommends that the District Court transfer this matter to the United States District Court for the Southern District of Georgia pursuant to 28 U.S.C. § 1631.

## I.      BACKGROUND

Plaintiffs' claims stem from allegedly false and libelous statements Defendant made about Plaintiffs after the death of former NFL wide receiver Demaryius Thomas ("Thomas"). Mr. Thomas passed away on December 9, 2021, following a seizure.  Compl., D.E. 1, ¶¶ 6, 7.

The allegations set forth herein are derived from the Complaint, which the Court must accept as true for purposes of a motion to dismiss for lack of personal jurisdiction.  *Marten v. Godwin*, 499 F.3d 290, 295 n.2 (3d Cir. 2007) (citing *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992)).  Stewart was Thomas's longtime friend and girlfriend.  *Id.* ¶ 8. She and Thomas met as student athletes at Georgia Tech and became romantically involved in 2009.  *Id.* ¶¶ 8, 9.  Stewart and Thomas remained close from 2009 until Thomas's death.  *Id.* ¶ 10.  Stewart lived in New Jersey but moved to Roswell, Georgia to live with, and assist, Thomas in or around February 2021.  *Id.* ¶¶ 1, 24; s*ee also* Certification of Bianca Stewart ("Stewart Cert."), Oct. 3, 2022, D.E. 10, ¶¶ 12-13.  Stewart moved back to New Jersey sometime after Mr. Thomas passed in December 2021.  Stewart Cert., Oct. 3, 2022, D.E. 10, ¶ 14.

Ms. Stuckey-Smith is Thomas's mother and, at all relevant times, a resident of Georgia. Compl., D.E. 1, ¶¶ 4, 11; s*ee also* Declaration of Katina Stuckey-Smith ("Stuckey-Smith Decl."), Sept. 12, 2022, D.E. 7-1, ¶¶ 4.  She asserts that she has never conducted business in New Jersey, does not travel to New Jersey except to attend a single football game in 2019, and otherwise has no contacts with New Jersey.  *Id.* ¶¶ 4-9.

Thomas was drafted by the Denver Broncos in 2010 and retired from the NFL in June 2021.  Compl.*,* D.E.1, ¶ 16.  However, Thomas's professional career effectively ended in 2020, when he could no longer play football due to neurological issues, resulting in seizures.  *Id.*

Thomas experienced repeated seizures after leaving the NFL, which caused Stewart to relocate to Georgia to care for him. *Id.* ¶¶ 16-26. Additionally, in May 2021, Thomas and Stewart formulated a plan to create a non-profit organization, TGH, "that would work towards promoting awareness and understanding of neurodegenerative diseases affecting professional athletes." *Id.* ¶ 29. But despite preparing an extensive business plan and considering property in Arizona and Tennessee to serve as the headquarters for TGH, Thomas and Stewart did not formally incorporate TGH before his passing.[1] *Id.* ¶¶ 31, 60-61.

Stewart contends that shortly after Thomas's passing, Defendant began defaming her by spreading knowingly false statements about her both verbally and in writing via email and text messages to friends, family, and others. *Id.* ¶ 53. Stewart claims that Defendant told others, in part, that Stewart: (1) had stolen property from Thomas's residence; (2) did not love Thomas; (3) was with Thomas for his money; (4) had been having an affair with a married professional athlete while she was with Thomas; and (5) had stolen Thomas's cell phone. *Id.* ¶¶ 47-56.

Following Thomas's passing, Stewart secured the help of Thomas's father, Bobby Thomas, and commitments from sponsors toward TGH, and incorporated TGH as a § 501(c)(3) charitable organization on February 23, 2022. *Id.* ¶¶ 27, 65-68. Stewart, Bobby Thomas, and

---

[1] Plaintiffs assert that by October 2021, Thomas had put together a 164-page PowerPoint presentation that contained his vision for TGH, which included "potential site locations for the facility, and details and background research discussing CTE and potential avenues for assisting athletes with rehabilitation from head trauma, brain injuries and associated neurological conditions." *Id.* ¶¶ 57-58. In or around this same time, Thomas and Peter Wright ("Wright"), Thomas's financial advisor and later executor of Thomas's Estate, sought legal advice to plan Thomas's estate and provide for his intended charitable endeavors, TGH among them. *Id.* ¶¶ 59. Thomas passed away before the estate and financial planning could be completed. *Id.* ¶¶ 60.

other board members began fundraising, establishing a website, and marketing for TGH.  *Id.* ¶¶ 69-71.

In April 2022, Stewart approached Wright to ask if Thomas's estate would donate to TGH.  *Id.* ¶ 77.  Between April and June 2022, after learning of TGH's existence and Stewart's request for a donation, Defendant repeatedly began inquiring of Wright whether TGH could be shut down or dissolved.  *Id.* ¶¶ 78, 80.  Stewart claims that because Defendant was close with both Wright and Bobby Thomas, who was on TGH's board of directors, that Defendant knew that TGH was something important to Thomas before his passing. *Id.* ¶ 82.

In late Spring and early Summer 2022, Stewart began aggressively promoting TGH on social media.  *Id.* ¶¶ 79, 83.  In response to TGH's promotions on social media, on June 28, 2022, Defendant posted on her Instagram account, "@stuckey.michelle":

> This is so not true. This is was [sic] not founded by DT. Do your own research and come to your own conclusions. It is sad the length some people will go through to try and get the credibility, respect and support DT have from so many people. To those of you who really knew THAT you should know what and whom he was passionate about. Trying to discredit me as his mother is the ultimate mistake and the biggest clue that many didn't know DT as they claim. The permission to try and create this nonprofit wasn't given by his father mor myself to ANYONE... the best thing ANYONE can do at this point is respect my son, because some people didn't allow him to experience peace on this earth while he was here... but I be damned if ANYONE will continue to try and attach his name to something or someone who wasn't part of his plan or future... Rest in Peace &Power my King LL88.

*Id.* ¶ 85; *see also id.* at D.E. 1-1, Exh. A (reposting of Defendant's June 28, 2022 post on Instagram account "@wagsunfiltered").  On July 2, 2022, Defendant posted again to her Instagram account.  This time, she attached a screenshot of TGH's certificate of incorporation, stated that TGH had no affiliation with Thomas's estate or family, and instead requested that any

4

donations in Thomas's honor be made to "the Demaryius Thomas, One Love 88 Foundation," and attached a link to that foundation.  *Id.* ¶ 93.

On July 4, 2022, Defendant allegedly posted additional defamatory remarks about TGH and Stewart to a different Instagram account she held, "@kstyling87."  *Id.* ¶¶ 98-99.  These defamatory posts included statements that Stewart: was "a scammer" who was using TGH to get money because Thomas was no longer alive to support her; "took advantage" of Thomas when he was "sick and vulnerable;" and had been having an affair with a professional athlete that had created friction in her relationship with Thomas.  *Id.* ¶¶ 100-101, 104.  These posts also accused TGH of scamming people with a "nonprofit [Thomas] never started or wanted … and [using] they money to live a lavish lifestyle" and,

> last week miss T posted that an Organization was started called the Gladiator's Hub and it was not founded by #demaryiusthomas and they using his name for clout. I spent a week getting the full story to find that the org is a fraud and ran by a fraud. Stay tune [sic].

*Id.* ¶¶ 102-103.

Plaintiffs allege that other news media sites, websites, and blogs commented on or reposted Defendant's social media posts.  *Id.* ¶¶ 88-91, 97.  Similarly, other Instagram accounts and Facebook pages picked up the allegedly defamatory statements, which further spread those postings in the United States and elsewhere.  *Id.* ¶¶ 91, 97.

Plaintiffs contend that Defendant's posts have caused them to sustain both reputational and financial harm.  *Id.* ¶¶ 105-117.  Stewart asserts that Defendant's statements have caused her to lose both business and media opportunities, particularly with respect to the advancement of her clothing line.  *Id.* ¶¶ 108-109, 111-112.  With respect to TGH, Plaintiffs maintain that the non-profit lost millions of dollars of capital commitment and were forced to cancel a convention

5

at the Broadmoor Hotel in Colorado, at which TGH sought to raise money through fundraising efforts.  *Id.* ¶ 115.

On July 13, 2022, Plaintiffs filed a one-count Complaint against Defendant, alleging that she had defamed them.  Compl., D.E. 1.  As noted above, Stewart has resided in New Jersey except for the period of February 2021 to when Mr. Thomas passed in December 2021.  TGH, of which Stewart is the President and Chairperson of its Board of Directors, is a § 501(c)(3) not-for-profit organization incorporated in Arizona.  Stewart asserts that she operates TGH from her residence in New Jersey.  *Id.* ¶¶ 2, 3.  Plaintiffs brought this action in federal court based on diversity jurisdiction, as there is complete diversity between the parties and the amount in controversy exceeds $75,000.  *Id.* ¶ 5.

On September 9, 2022, Defendant filed a motion to dismiss the Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  Def.'s Mot., D.E. 7.  Defendant's motion contends that Plaintiffs cannot establish either general or specific jurisdiction over her in New Jersey.  First, Defendant contends that Plaintiffs have not demonstrated that Defendant has sufficient minimum contacts with New Jersey for purposes of general jurisdiction.  *Id.* at 9-10.  Second, Defendant argues that Plaintiffs have not proven that Defendant aimed her tortious conduct at the forum state, sufficient to confer specific jurisdiction.  *Id.* at 10-21.  In opposition, Plaintiffs argue that Defendant aimed her conduct at New Jersey, and knew that Plaintiffs would suffer the effects of her conduct here.  Pls.' Opp'n Br., D.E. 11, at 10.  In reply, Defendant reiterates that she never knew Stewart had relocated to New Jersey after Mr. Thomas passed away, and challenges whether TGH operates in New Jersey.  Def.'s Reply, D.E. 15, at 11-15.

## II. DISCUSSION

A decision regarding a motion to dismiss is dispositive. *See Thomas v. Vinculum Grp. Ltd.*, No. 15-3194, 2015 WL 13504683, at *1 (D.N.J. Dec. 23, 2015) (stating Magistrate Judges may submit Reports and Recommendations to the district court on motions to dismiss). Accordingly, this Court addresses Defendant's motion via Report and Recommendation.

### A. Personal Jurisdiction

Where a defendant moves to dismiss for lack of personal jurisdiction under Federal Rule of Procedure 12(b)(2), the plaintiff bears the burden of proving, by a preponderance of the evidence, that personal jurisdiction is proper over the moving party. *See IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 257 (3d Cir. 1998); *DePaco v. Cofina Media, SA*, No. 21-14409, 2022 WL 3646616, at *2 (D.N.J. Aug. 24, 2022). If the court does not hold an evidentiary hearing on the motion to dismiss, as is the case here, the plaintiff need only establish a prima facie case of personal jurisdiction. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). Unlike a motion to dismiss for failure to state a claim, a plaintiff may not rely solely on pleadings for contests of personal jurisdiction, but must establish jurisdictional facts through sworn affidavits or other competent evidence. *See, e.g., Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984); *Sciore v. Phung*, No. 19-13775, 2022 WL 950261, at *4 (D.N.J. Mar. 30, 2022) (quoting *Weber v. Jolly Hotels*, 977 F. Supp. 327, 331 (D.N.J. 1997)). The court, at the same time, must assume that the plaintiff's allegations are true. *Miller Yacht Sales, Inc.*, 384 F.3d at 97 (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)).

Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure allows a federal district court to "exercise[] personal jurisdiction according to the law of the state where it sits." *O'Connor v.*

*Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007); *see Marten*, 499 F.3d at 296; *see generally Smith v. S&S Dundalk Eng'g Works, Ltd.*, 139 F. Supp. 2d 610, 617 (D.N.J. 2001) (noting that former Rule 4(e) is now incorporated into Rule 4(k)).  Normally, this is a two-part inquiry: there must be a state statutory basis for exercising jurisdiction over a non-resident defendant as well as a constitutional basis whereby the minimum contacts between the nonresident and the forum state satisfy due process under the Fourteenth Amendment.  *See Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009).  New Jersey's long-arm statute, however, extends jurisdiction over non-resident defendants to the fullest extent permitted by the United States Constitution.  *Carteret Sav. Bank, FA*, 954 F.2d at 145; *see also* N.J. Ct. R. 4-4(b)(1); *YA Global Invs., L.P. v. Cliff*, 419 N.J. Super. 1, 8 (App. Div. 2011) (citing *Avdel Corp. v. Mecure*, 58 N.J. 264, 268 (1971)).  Therefore, in New Jersey, the court's inquiry into whether personal jurisdiction exists over a non-resident defendant concerns only questions of due process under the Constitution.  *Carteret Sav. Bank, FA*, 954 F.2d at 145.

Personal jurisdiction may be exercised under two distinct theories: general or specific jurisdiction.  *Marten*, 499 F.3d at 296; *O'Connor*, 496 F.3d at 317.  Here, Plaintiffs concede that general personal jurisdiction does not exist. Pls.' Opp'n Br., D.E. 11, at 7 ("Plaintiffs concede that there is no basis for general jurisdiction over the Defendant given her limited dealings in this forum.").  And given the paucity of Defendant's contacts with New Jersey, *supra* page 2, the Court concurs.  Accordingly, the Undersigned will consider only whether this Court may exercise specific personal jurisdiction over Defendant.

8

On the issue of specific jurisdiction, Plaintiffs do not argue that the Defendant's contacts with New Jersey satisfy the traditional three-step analysis for specific jurisdiction.[2] Instead, Plaintiffs rely on *Calder* to argue that the Court has specific personal jurisdiction over Defendant based on the effects of Defendant's social media statements in New Jersey.[3]

---

[2] Although Plaintiff does not rely on the traditional three-step analysis, the Court considers it in an abundance of caution, and particularly Defendant's contention that the Court may not assert personal jurisdiction over her because, as a nonresident of the forum state of New Jersey, she lacks sufficient minimum contacts with that State. In the traditional personal jurisdiction analysis, courts analyze the defendant's "minimum contacts," which requires deciding whether: (i) defendant "purposely directed" activities at the forum state; (ii) plaintiff's core claim arises out of or relates to "at least one of those specific activities:" and (iii) exercising jurisdiction over the non-resident defendant "comport[s] with fair play and substantial justice." *Marten*, 499 F.3d at 296; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) ("Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries 'that arise out of or relate to' those activities.") (internal citations omitted).

In this case, Defendant does not reside in New Jersey and has little, if any, contacts with New Jersey. Defendant's allegedly defamatory social media posts make no mention of Plaintiffs' presence in New Jersey and do not appear to reference New Jersey at all. The content was posted on platforms that have nationwide and international audiences, as opposed to a New Jersey-focused platform. Plaintiff does not assert, nor does a review of the posts (Compl., D.E. 1-1, Exh. A) reveal, that Defendant's statements mentioned New Jersey or otherwise were directed at New Jersey.

[3] As the Court of Appeals for the Third Circuit stated, "[t]he effects test and traditional specific jurisdiction analysis are different, but they are cut from the same cloth." *Marten*, 499 F.3d at 297. Courts have used one, the other, or both tests to analyze a defendant's contacts. *See, e.g.*, *Marten*, 499 F.3d at 296–97 (not considering traditional test because defendants only argued *Calder*); *Miller*, 384 F.3d at 96 n.2 (not considering *Calder* because specific jurisdiction existed under traditional test); *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454–55 & n.6 (3d Cir. 2003) (considering both *Calder* and traditional test); *IMO Indus.*, 155 F.3d at 259–60 & n.3 (same); *Carteret*, 954 F.2d at 147–48 (substantially only considering traditional test).

Generally, a court analyzes specific personal jurisdiction on a defendant-by-defendant and claim-by-claim basis. *Miller*, 384 F.3d at 95 n.1 (citing *Calder*, 465 U.S. at 790); *see also Marten*, 499 F.3d at 296 (noting that claim-by-claim analysis occurs because specific jurisdiction depends on the relationship between the claims and contacts); *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (noting that a court may have personal jurisdiction over a particular defendant for some claims but not others). Certain situations, however, may allow a court to assess defendants together, assess claims together, or both. *See, e.g., Carteret*, 954 F.2d at 145 n.6 (evaluating defendants together because they are liable to each other through their partnership); *O'Connor*, 496 F.3d at 318 n.3 (evaluating claims together because of factual overlap and because one claim was derivative of another); *Miller*, 384 F.3d at 97–100 (evaluating defendants and related claims together); *see also Remick*, 238 F.3d at 255–56 (noting that it may not be necessary to do a claim-by-claim analysis in every multiple-claim case).

### B. *Calder* Effects Test

Where personal jurisdiction is predicated on the defendant's alleged tortious conduct—as it is here by virtue of Plaintiffs' defamation claim—courts in the Third Circuit apply the *Calder* effects test. In *Calder*, the plaintiff, an entertainer living in California, sued two Florida residents for libel based on an article they co-authored which was published in the National Enquirer. 465 U.S. 783. The Supreme Court in *Calder* found that the Florida-based defendants had aimed their tortious conduct at the forum state, California, because the allegedly defamatory article was focused on California, the magazine had a circulation in California of 600,000, nearly twice as many as the next state, defendants relied upon sources located in California for their article, and the Hollywood industry created the requisite nexus in California. *Id.* at 785-89.

To establish minimum contacts under the *Calder* effects test in the Third Circuit, a plaintiff must show that the: (i) defendant committed an intentional tort; (ii) plaintiff felt the brunt or the harm of the intentional tort in the forum state; and (iii) defendant expressly aimed the tortious conduct at the forum state, making the forum state the focal point of the tortious activity. *Marten*, 499 F.2d at 296 (quoting *IMO Indus.*, 155 F.3d at 265-66); *Remick*, 238 F.3d at 258. The Third Circuit has cautioned that the effects test is to be applied narrowly: "At a minimum, [Plaintiff] must allege facts that establish that defendants 'expressly aimed' their conduct" at the forum state. *Marks v. Alfa Grp.*, 369 F. App'x 368, 370 (3d Cir. 2010). Courts need not consider the first two elements if the third element is not met. *Marten*, 499 F.3d at 297.

Plaintiffs maintain an onerous burden in proving that defendants "expressly aimed" their conduct at the forum state. To do so, a plaintiff must show that: (1) "the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum;" *and* (ii) "point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Id.* at 297-98 (quoting *IMO Indus., Inc.*, 155 F.3d at 266) (emphasis added). Many Circuits, including the Third Circuit, "require[] more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum." *IMO Indus., Inc.*, 155 F.3d at 256 (holding that *Calder* effects test will be satisfied only if the plaintiff establishes that the defendant made the forum the focal point of the tortious activity) (collecting cases). "Simply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet this requirement." *Id.* at 265. Even though "a plaintiff's residence is relevant to the 'jurisdictional inquiry,'" "the state of a plaintiff's residence does not on its own create jurisdiction over nonresident defendants." *Marten*, 499 F.3d at 298.

For example, the Third Circuit has found that "the mere allegation that the plaintiff feels the effect of the defendant's tortious conduct in the forum because the plaintiff is located there is insufficient to satisfy *Calder*." *IMO Indus., Inc.,* 155 F.3d at 263. Similarly, the mere placement of content on the Internet, by itself, does not subject the poster to personal jurisdiction in any state in which someone accesses that content. *Triestman v. Tuerkheimer*, No. 17-8187, 2018 WL 2433595, at *3 (D.N.J. May 11, 2018) (quoting *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002));[4] *but see Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 452-53 (E.D. Pa. 2021) (holding that the defendant expressly aimed his Twitter posts at the forum state of Pennsylvania because he (i) knew that plaintiff was affiliated with a university in the forum state; (ii) attended that university himself; (iii) refers to the university in his tweets; and (iv) references events that occurred in Pennsylvania while he was in the forum). Absent showing that the defendant intentionally targeted and focused their conduct on the forum, the plaintiff will fail to establish personal jurisdiction under the effects test. *Marten*, 499 F.3d at 298.

---

[4] "[M]erely posting a defamatory statement about the plaintiff online is not enough to hale the poster into the state where the plaintiff resides; instead, the poster's conduct must have involved the plaintiff's state in some additional way." *Vangheluwe v. Got News, LLC*, 365 F. Supp. 3d 850, 857 (E.D. Mich. 2019) (citing *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 552 (6th Cir. 2007)). "For instance, the internet posting might be of more interest to people in the plaintiff's state than nationally. Or . . . the post might be of no special interest to those in the plaintiff's state but the poster makes special effort to publicize the poster there." *Id.* at 857-58. *See also Binion v. O'Neal*, 95 F. Supp. 3d 1055, 1060-61 (E.D. Mich. 2015) (finding the exercise of personal jurisdiction improper over non-Michigan resident who posted allegedly defamatory content on Instagram and Twitter, despite plaintiff's feeling harm in the forum state, and despite defendant having property interests in the forum state, because plaintiff could not establish that defendant's posts were expressly aimed at or disseminated in the forum state, nor was there any allegation that defendant "took affirmative steps to direct the posts to a Michigan audience").

Applying these principles here, the Undersigned finds that Plaintiffs have not carried their burden of establishing personal jurisdiction under the *Calder* effects test. Even assuming Plaintiffs successfully state their case for this Court's exercise of personal jurisdiction over Defendant with respect to the first two elements of the *Calder* effects test, *i.e.*, that Defendant committed defamation, and that Plaintiffs felt the brunt of the defamation in New Jersey, Plaintiffs fail on the third element. Plaintiffs have failed to demonstrate that Defendant expressly aimed her conduct at the forum state. *IMO Industries*, 155 F.3d at 265–66.

As noted above, Plaintiffs have the burden of persuasion to establish that personal jurisdiction exists and must persuade the Court with competent evidence. *IMO Indus., Inc.*, 155 F.3d at 257; *Metcalfe*, 566 F.3d at 330. Plaintiffs may not solely rely on their pleadings. *Time Share*, 735 F.2d at 66 n.9 (explaining that, unlike a motion for failure to state a claim, plaintiff may not rely on pleadings alone for contests of personal jurisdiction). But even considering the social media posts included with the Complaint and Ms. Stewart's Certification, Plaintiffs have provided no reliable basis to conclude that Defendant specifically directed her communications at New Jersey, or at Plaintiffs in New Jersey. Plaintiff's Certification focuses on Stewart's and TGH's connection to New Jersey, including that Stewart operated TGH out of her home in New Jersey. *See, e.g.,* Stewart Cert., Oct. 3, 2022, D.E. 10, ¶¶ 18-20, 23-25; D.E. 10-1, Exh. A. But as explained above, the fact that Stewart lives in New Jersey and operates TGH out of her home in New Jersey is not sufficient to carry her burden of showing that Defendant targeted the allegedly defamatory communications at New Jersey. *DePaco*, 2022 WL 3646616, at *4 (D.N.J. Aug. 24, 2022). And on that issue, Plaintiff offers very little. At best, Plaintiff surmises that Defendant must have targeted her posts at Stewart in New Jersey, because "[i]n March 2022, I

13

would frequently post on social media from Newark Airport and highlight my travels to and from New Jersey and for meetings associated with the Gladiator's Hub. . . . Smith was aware of these social media posts because she was actively following my account at the time." Stewart Cert., Oct. 3, 2022, D.E. 10, ¶¶ 32-33. But Defendant steadfastly denies knowing that Plaintiffs are located in New Jersey. Stuckey-Smith Decl., Sept. 12, 2022, D.E. 7-1, ¶¶ 12, 18-20. And in fact, TGH's certificate of incorporation provides no indication that it conducts its business in New Jersey. *See* Compl., D.E. 1-1, Exh. A, at 13 (certificate of incorporation that Defendant included in July 2, 2022 Instagram post). The certificate lists Arizona as the state of incorporation and its principal address, and designates Ms. Stewart as being at that address. *Id.* It also states that "[t]he company has 4 contacts on record: The contacts are Bianca Ashley Stewart from Phoenix AZ" and three other individuals, including TGH's registered agent, all from Phoenix, Arizona. *Id.* The certificate of incorporation makes no mention of New Jersey.

More importantly, the allegedly defamatory posts provide no indication that Defendant specifically targeted New Jersey. For example, Defendant's June 28, 2022 Instagram post focuses on the assertion that TGH "was not founded by" Mr. Thomas. *Id.* at 19. The post does not mention New Jersey once, much less Ms. Stewart's activities on behalf of TGH in New Jersey. And as noted above, nothing in TGH's certificate of incorporation itself suggests any connection to New Jersey. Similarly, Defendant's July 2, 2022 Instagram post asserted that TGH was not affiliated with Mr. Thomas's estate or family. *Id.* at 33. The post attached a photo of the certificate of incorporation. It made no mention of Ms. Stewart at all and, as noted above, the attached certificate of incorporation ties TGH solely to Arizona. The Instagram posts by the "@kstlying87" account also do not target Plaintiffs specifically in New Jersey or provide any

14

indication that Defendant targeted her posts to New Jersey. Further, Plaintiffs do not assert, either in the Complaint or in Ms. Stewart's Certification, that either the "@stuckey.michelle" Instagram account or the "@kstyling87" account tagged Ms. Stewart or TGH in the allegedly defamatory posts. And this Court's own review of the allegedly defamatory posts provides no suggestion that Defendant tagged either Plaintiff.[5]

Plaintiff asserts that Defendant's allegedly defamatory statements damaged her reputation in New Jersey. For example, Stewart certifies, "[m]y belief is that Smith deliberately attacked the organization on social media for the purpose of inflicting damage on my reputation, to try to accomplish what she failed to do when Demaryius was alive, separate me from her son." Stewart Cert., Oct. 3, 2022, D.E. 10, ¶ 39. But that assertion, even if true, is not particularly relevant to the specific personal jurisdiction analysis. The *Calder* effects test concerns a defendant's contacts with the forum and the relationship between those contacts and the claims at issue. Although Ms. Stewart's Certification may establish that Defendant sought to discredit Plaintiffs, it does not establish that Defendant directed her activities at New Jersey. *Walden v. Fiore*, 571 U.S. 277, 285–86 (2014) (finding that plaintiff must show the "defendant's contacts

---

[5] Instagram explains that "[t]he people you tag in a photo or video are visible to anyone who can see it. If your Instagram account is set to public, anyone can see the photo or video, and the person you tagged will get a notification." INSTAGRAM, https://www.help.instagram.com/627963287377328 (last visited Oct. 28, 2022). Facebook explains that "[w]hen you tag someone, you create a link to their profile. This means that: The post you tag in may also be added to that person's timeline . . . When you tag someone, they'll be notified. Also, if you or a friend tags someone in your post, the post could be visible to the audience you selected plus friends of the tagged person." FACEBOOK, https://www.facebook.com/help/124970597582337/?helpref=uf_share (last visited Oct. 28, 2022).

with the forum State itself, not . . . with persons who reside there" and that "the plaintiff cannot be the only link between the defendant and the forum."). Even assuming that Plaintiffs felt the brunt of the harm in New Jersey, that, without more, is insufficient for this Court to find that it has personal jurisdiction over Defendant in the absence of facts establishing that Defendant deliberately targeted New Jersey. In *Marten*, the Third Circuit explained that a plaintiff seeking to establish specific jurisdiction in a particular forum must present facts establishing that the defendant aimed her tortious conduct to that forum, knowing that the plaintiff would suffer harm there. *Marten*, 499 F.3d at 298-99. Plaintiffs have not made the requisite showing. As noted, the allegedly defamatory posts do not mention New Jersey, or specifically discuss Plaintiffs' activities in New Jersey, or even tag Plaintiffs. Moreover, Defendant declares that before receiving Plaintiffs' Complaint, she did not know that Stewart was a New Jersey resident or that TGH was headquartered in New Jersey. Stuckey-Smith Decl., Sept. 12, 2022, D.E. 7-1, ¶¶ 11, 12, 18. She was aware that Stewart spent a lot of time in Georgia and in California, where her business was located, and that TGH was an Arizona non-profit corporation. *Id.* ¶¶ 14, 15, 19.

It is certainly foreseeable that some of the harm would be felt in New Jersey because Ms. Stewart lives and works here. But such foreseeability is not sufficient for an assertion of jurisdiction. *World–Wide Volkswagen Corp.,* 444 U.S. 286, 295 (1980); *Rush v. Savchuk,* 444 U.S. 320, 328–29 (1980). Although it is eminently possible, perhaps likely, that some New Jersey residents viewed the allegedly defamatory statements, they are but a fraction of the worldwide Internet users who received or viewed such statements. "[T]he mere allegations that the Plaintiff feels the effect of the Defendant's tortious conduct in the forum because the Plaintiff is located there is insufficient to satisfy *Calder.*" *See IMO,* 155 F.3d at 263. Harm felt in the

16

forum state from conduct occurring outside the state is insufficient to satisfy due process, absent a showing that the alleged tortfeasor deliberately or knowingly targeted the forum state. *Remick*, 238 F.3d at 259 (3d Cir. 2011) (holding that allegedly defamatory letter read by individuals in the forum state did not target anyone other than the plaintiff and thus, any resulting harm in the forum state was "merely incidental"). *See Weerahandi v. Shelesh*, No. 16-6131, 2017 WL 4330365, at *5 (D.N.J. Sept. 29, 2017) (listing cases) ("[i]t is not sufficient that a defendant was aware a plaintiff would be harmed in the forum").

Plaintiffs readily admit that Defendant posted the statements on platforms that have a nationwide and international audience. *See*, *e.g.*, Compl., ¶ 89 ("Flipboard, a new media site with over five hundred million subscribers, reposted Smith falsehoods, providing publicity to a larger audience."); *id.* ¶ 90 ("On June 29, 2022, Smith's post was also picked up and republished by the highly popular 'WagsUnfiltered' Instagram account, which provided significant additional publicity to the false claims."); *id.* ¶ 91 ("By June 30, 2022, NFL-London's Official Facebook page had reposted an article featuring the headline that Smith had 'called out an NGO on Instagram' for 'lying and falsely using Thomas' name,' spreading the false narrative internationally."); *id.* ¶ 97 ("Smith's July 2, 2022 Instagram post was soon thereafter republished by '@kryazyk,' a popular account with over 75,000 followers, providing wider publicity to the false claims contained therein.").

The factors that the *Calder* Court applied to assess specific personal jurisdiction do not support its exercise over Defendant in New Jersey. Defendant, a Georgia resident, posted allegedly defamatory statements on the Internet about Stewart, a New Jersey resident, and TGH, a § 501(c)(3) not-for-profit organization incorporated in Arizona with its listed principal place of

17

business in Arizona. Defendant's postings do not reference or in any way seem to target New Jersey, or Plaintiffs' activities *vel non* in New Jersey. The posts do not tag Plaintiffs. Rather, Defendant's posts on social media are aimed at the general public nationwide, even if they addressed the Plaintiffs or criticized Plaintiffs' actions. In *Calder*, by contrast, the out-of-state defendant expressly targeted California because it was "the focal point both of the story and of the harm suffered." *Calder*, 465 U.S. 789. The same cannot be said here because New Jersey is not the focal point of the allegedly defamatory statements. Plaintiffs have failed to show specific activity showing that Defendant "expressly aimed" her allegedly tortious conduct at the forum state of New Jersey. *See Marten*, 499 F.3d at 299. Accordingly, Plaintiffs cannot meet the *Calder* effects test, and the Court lacks personal jurisdiction over Defendant.

### C. Transfer

The parties did not address in their initial briefing whether, if this Court lacks personal jurisdiction, transfer would be appropriate in lieu of dismissal. Therefore, the Court directed the parties to file supplemental briefs setting forth their positions on transfer. Order, Oct. 17, 2022, D.E. 17. In accordance with that Order, Plaintiffs filed a letter brief on October 21, 2022, suggesting that transfer to Georgia would be appropriate pursuant to 28 U.S.C. § 1631, if this Court finds personal jurisdiction is lacking. Pl.'s Brief, D.E. 21, at 3. Plaintiffs assert that the Court should transfer this action to either the Northern District of Georgia, the district where Demaryius Thomas maintained a home and a substantial portion of the events surrounding this action occurred, or the Southern District of Georgia, where Defendant resides. *Id.* Defendant maintains that the Court should decline to exercise its discretion to transfer this case. Defendant reasons that Plaintiffs are free to re-file the action, because their defamation claim has not yet

18

expired under either New Jersey or Georgia's applicable one-year statute of limitations (the first alleged defamatory statement did not occur until December 2021, at the earliest).[6] Def.'s Brief, D.E. 22, at 2. Thus, Defendant contends that the interests of justice do not demand transfer and Plaintiffs would suffer little time, effort, or expense if required to refile in the appropriate district. *Id.* at 2-3.

If a court finds that it lacks personal jurisdiction over a defendant, 28 U.S.C. § 1631 authorizes the transfer of venue, providing that a "court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed." As Defendant acknowledges, Def.'s Brief, D.E. 22, at 3, the Court has substantial discretion under § 1631 to transfer the action. The Supreme Court has instructed that dismissal is a "harsh remedy" and transfer is "the preferred remedy." *Goldlawr v. Heiman*, 369 U.S. 463, 466 (1962). *See also Barber v. DePuy Synthes Prods., Inc.*, No. 21-923, 2021 WL 3076933, *2 ("Because transfer is favored over dismissal, there is a rebuttable presumption in favor of transfer.") (citations omitted).

In this case, the Undersigned finds that it is in the interests of justice to transfer this case to the Southern District of Georgia. There is no dispute that Defendant resides in Dublin, Georgia, which is part of the Southern District of Georgia, and thus that court would have personal jurisdiction over her. Second, it is reasonable to presume that the allegedly defamatory posts originated in whole or part from Georgia. *See* Stuckey-Smith Decl., Sept. 12, 2022, D.E.

---

[6] Defendant also takes issue with the fact that Plaintiffs reference transfer to the Middle District of Georgia in the caption of their argument. Def.'s Brief, D.E. 22, at 1-2. It appears that the reference to the Middle District of Georgia in the caption simply was a typographical error as the body of Plaintiffs' argument references only the Northern and Southern Districts of Georgia. Pl.'s Brief, D.E. 21, at 1-4.

7-1, ¶ 23 ("I do not regularly travel out of state."). Third, even if the statute of limitations was an appropriate consideration, *see Ameripay LLC v. Ameripay Payroll Ltd.,* 334 F. Supp.2d 629, 638 (D.N.J. 2004) (reasoning that expiration of the statute of limitation is relevant to traditional transfer analysis, but not relevant to jurisdictional inquiry), Defendant acknowledges that the limitations period has not yet expired. Fourth, this matter has been pending for approximately three months, and discovery has not yet begun. Transfer will neither present a tactical advantage to Plaintiffs, nor prejudice Defendant. Therefore, the Undersigned recommends that in the interests of justice, transfer under § 1631 is appropriate in lieu of dismissal.

### III. CONCLUSION

For the reasons below, the Undersigned concludes that this Court lacks personal jurisdiction over Defendant, and respectfully recommends that the District Court transfer this matter to the United States District Court for the Southern District of Georgia pursuant to 28 U.S.C. § 1631.

The parties have fourteen days to file and serve objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 7.1(c)(2).

                                                          s/ Michael A. Hammer
                                                          UNITED STATES MAGISTRATE JUDGE

Date: October 28, 2022